**Thomas P. KERR, Plaintiff,**

v.

**William B. KEOGH, Administrator, and the Trustees of the Pipefitters Local 537 Pension Plan, Defendants.**

**No. CIV.A. 02–12461NMG.**

United States District Court,
D. Massachusetts.

Oct. 20, 2004.

James F. Grosso, O'Reilly, Grosso & Gross PC, Framingham, MA, for Thomas P. Kerr, Plaintiff.

Christopher N. Souris, Krakow, Souris & Birmingham, Boston, MA, for William B. Keogh, Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the present dispute, Plaintiff Thomas P. Kerr ("Kerr") claims that he has been wrongfully deprived of certain pension benefits to which he is entitled by William B. Keogh ("Keogh") and the Board of Trustees of the Pipefitters Local 537 Pension Plan ("the Board"). Kerr alleges that the Defendants have violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), and have broken contractual promises made to him. Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56.

### I. *Factual Background*

The following facts are taken from Defendants' combined statement of undisputed material facts and declaration of Charles T. Hannaford (Docket No. 15), the affidavit of Thomas P. Kerr (Docket No. 17), memoranda in support of motion for summary judgment (Docket Nos. 14, 18) and the oppositions thereto (Docket Nos. 16, 20). The facts are not in dispute except where noted.

*The Pipefitters Local 537 Pension Fund*

The Pipefitters Local 537 Pension Fund ("the Fund") is a pension benefit plan subject to the ERISA. The Fund is administered by defendant Board of Trustees. In accordance with the trust agreement, the Board has adopted a plan of benefits ("the Plan") to provide retirement benefits to participants.

The amount of a participant's pension benefit is determined, in part, by the number of credits the participant has earned. Credits are a measure of the amount of "covered employment" that a participant has performed. Covered employment includes, among other things, work as a pipefitter and work for Local 537.

The amount of a participant's prospective pension benefit can increase before retirement if the Board adopts an "accrual-rate increase." The Board adopted such increases in 1991, 1992, 1993, 1996, 1998 and 2000. For the 1993 increase and all increases thereafter, the Board conditioned a participant's increase on the participant performing a minimum number of hours of covered work after the increase went into effect.

Similarly, the amount of a retiree's pension benefit can increase if the Board adopts a cost of living adjustment ("COLA"). COLAs are benefit increases that are applied to retirees who are already receiving pension benefits.

The existence of a "break in service" can affect the calculation of a participant's pension benefit. A break in service occurs if a participant fails, for two consecutive years before retirement, to perform 280 hours of "covered employment" per year. If a break in service occurs, the participant's benefit becomes fixed and no future accrual-rate increases or COLAs are thereafter available.

Complicating matters, a break in service does not occur if the participant enjoys a "grace period" for the time during which the break in service would have otherwise occurred. During and after a grace period, the participant remains eligible for ac-

crual-rate increases and COLAs. However-er, the Board changed the definition of grace period in 1995 and therein lies the crux of this dispute.

Prior to 1995, the Plan defined "grace period" to include time during which a participant worked for the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry in the United States and Canada, AFL–CIO ("the UA"), Local 537's parent organization. In 1995, the Board amended the definition to exclude work for the UA ("the 1995 Amendment"). As a result, a UA employee was exposed to a break in service.

*Thomas P. Kerr*

Plaintiff Kerr became a member of Local 537 in 1958 and worked as a pipefitter until 1972. Between 1972 and 1991, Kerr served in various elected positions within Local 537. In April 1991, Kerr discontinued working for Local 537 and took a job with the UA. In the process he received a substantial salary increase, healthcare benefits and an expense account.

Shortly after Kerr began working for the UA, he applied for an early retirement pension from the Fund. The Board denied his request but Kerr does not challenge that denial in this case.

On March 6, 1992, Kerr received a follow-up letter ("the 1992 Letter") from Keogh. At the time, Keogh was the Administrator of the Plan. In that letter, Keogh assured Kerr that he would "not incur a break in service" while working for the UA. The letter also confirmed that Kerr would continue to enjoy "all rights of an active employee," including "pension increases extended to active members." The parties disagree about whether those statements were meant to be promises or merely explanations of Plan policies at that time.

Between 1991 and 1995, Kerr's employment with the UA qualified for a grace period but after the 1995 Amendment, it did not, and Kerr suffered a break in service. However, the Board did not notify Kerr of the 1995 Amendment or of the "break" in his service. Kerr retired from the UA in 2001.

During February 2001, Kerr applied for and received pension benefits from the Fund based on credits he received for his covered work between 1958 and 1991. The Board ruled that Kerr was entitled to receive the benefit of the accrual-rate increases for 1991 and 1992, but not for 1993 or anytime thereafter. The Board also ruled that Kerr was disqualified from receiving any COLAs because of his break in service.

On December 24, 2002, Kerr filed suit in which he claimed that he is entitled to the benefit of the accrual-rate increases for the years 1996, 1998 and 2000, as well as to the benefit of a 2001 COLA and any future COLAs.

Defendants now move for summary judgment. They argue that Kerr is not entitled to any of the benefits in question because he did not detrimentally rely upon either the 1992 Letter or the 1995 Amendment. Defendants also argue that Kerr is not entitled to the accrual-rate increases in question because those increases were all conditioned on a participant performing a minimum of covered work. Kerr did not perform any such work.

## II. *Legal Analysis*

### A. Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *quoting Garside v. Osco Drug, Inc.*, 895

F.2d 46, 50 (1st Cir.1990). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the nonmoving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

### B. Analysis

■ Kerr seeks the benefit of accrual-rate increases for the years 1996, 1998, and 2000, as well as a 2001 COLA and all future COLAs. Kerr makes two arguments in support. They will be addressed in the numbered sections below.

### 1. *The 1992 Letter*

First, Kerr argues that the 1992 Letter contains a binding promise of the Board that Kerr would remain an "active employee" and would not suffer a break in service. Kerr was assessed a break in service and now seeks to enforce the alleged promise to obtain the benefits in question. Kerr's claim appears to be for promissory estoppel.

■ The law is well-settled that reliance is an element of promissory estoppel. *Neuhoff v. Marvin Lumber and Cedar Co.*, 370 F.3d 197, 203 n. 1 (1st Cir.2004). However, Massachusetts law does not recognize the remedy of "promissory estoppel." *Id.* Instead, "where a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract' and is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration." Therefore, regardless of the label given to Kerr's argument, reliance is an essential element of his claim. *See id.* at 203.

Notwithstanding that development, Kerr does not attempt to establish reliance on the 1992 Letter. He took his job with the UA almost a full year before he received the 1992 Letter. It could not have affected his decision to take the UA job.

Moreover, Kerr did not rely on the 1992 Letter by keeping his job with the UA. That job paid double the salary of a pipefitter and provided health insurance and an expense account. Understandably, Kerr does not assert that, had he known he was about to suffer a break in service, he would have resumed work as a pipefitter. He cannot establish reliance on the 1992 Letter and any argument that he does would fail.

### 2. *The 1995 Amendment*

■ Next, Kerr argues that the Board violated ERISA by failing to notify him of

the 1995 Amendment. He claims that, as a result, the amendment should not be applied to him and he should receive the benefits in question.

Pursuant to ERISA, 29 U.S.C. § 1024(b)(1)(B), the Board was required to notify participants of a Plan amendment "not later than 210 days after the end of the plan year in which the change is adopted .... " The Board did not provide that notice and appears to have thereby violated ERISA.

The flaw in Kerr's argument is, however, that a violation of ERISA's notice provisions does not necessarily invalidate the underlying amendment. *See Godwin v. Sun Life Assur. Co. of Canada,* 980 F.2d 323, 328 (5th Cir.1992) ("an employee cannot seek to avoid application of a valid amendment by claiming he never received notice of its adoption"); *Henne v. Allis-Chalmers Corp.,* 660 F.Supp. 1464, 1474 (E.D.Wis.1987). An amendment will be found invalid only if there is "active concealment" or "significant reliance" flowing from the lack of notice. *Id.* As discussed above, Kerr does not assert such reliance nor is there an allegation of active concealment.

Thus, regardless of whether the Board violated ERISA, the 1995 Amendment remains valid as to Kerr. Under the Amendment, he suffered a break in service and is therefore not entitled to the benefits in question.

Kerr points out that an amendment to a plan may not be retroactive and that any attempt to pass a retroactive amendment would be ineffective. That is true but irrelevant because the 1995 Amendment did not have retroactive effect. It changed the definition of a grace period prospectively, which is why Kerr *subsequently* experienced a break in service. After the Amendment, Kerr could still have gone back to work as a pipefitter and avoided a break in service entirely. The amendment could be considered retroactive only if the Board had declared that Kerr's *pre-Amendment* work created a break in service.

Finally, Kerr cites *Central Laborers' Pension Fund v. Heinz,* 541 U.S. 739, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004) as having "identical" facts and thus supporting his position. In *Heinz,* a group of retirees who were receiving pension benefits suffered a suspension of those benefits when the fund's definition of "disqualifying employment" changed. *Id.* at 2234–35. Disqualifying employment affected the eligibility of retirees for receipt of benefits. *Id.* By expanding the category, retirees who had been receiving benefits were thereafter deprived of them. *Id.* The retirees argued that ERISA's "anti-cutback rule," 29 U.S.C. § 1054(g), which states that an accrued benefit may not be reduced, had been violated. *Id.* at 2235. The Supreme Court ruled in favor of the retirees, holding that "accrued benefit" includes not only the dollar amount of the benefit but also the conditions of receipt. *Id.* at 2236. Thus, the fund could not change the conditions under which participants could receive the benefit that had already accrued. *Id.*

To the contrary, in the instant case, Kerr has not lost an accrued benefit, but, simply, an opportunity to obtain future benefits. After the 1995 Amendment passed, Kerr was to receive no less benefit and under no different conditions than he was to receive before the passage of the amendment. For example, had Kerr chosen to retire immediately after the Amendment, he would have received the exact same benefit under the same conditions that he would have received if the 1995 Amendment had never been adopted. It was only the conditions of receipt for future COLAs and accrual-rate increases

that changed.  Thus, *Heinz* is inapplicable to the present case and Kerr is not entitled to the benefits in question.[1]

### 3.  *Defendant Keogh*

The complaint names Keogh as a defendant but alleges no claims against him. His only involvement with this case is his role as the former Plan Administrator. Kerr's opposition papers do not oppose or even address Keogh's motion for summary judgment and it will, therefore, be allowed.

### ORDER

In accordance with the foregoing, the Defendants' motion for summary judgment (Docket No. 13) is ALLOWED.

**So ordered.**

---

**1.**  Furthermore, all of the accrual-rate increases in question were contingent on the subsequent performance of covered work by the participant.  Kerr performed no such work and thus, even if the Court had invalidated the 1995 Amendment or enforced the 1992 Letter, Kerr would not be entitled to any accrual-rate increases.